# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **DAVID C. STODDARD,** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **V.** | § | **C.A. NO. C-08-313** |
| | § | |
| **PETE GEREN, SECRETARY,** | § | |
| **DEPARTMENT OF THE ARMY,** | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Plaintiff David C. Stoddard alleges that defendant Pete Geren, in his official capacity as Secretary of the Department of the Army, violated plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*., the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*., ("ADA") and his constitutional rights under 42 U.S.C. § 1983.[1]  Defendant filed a motion to dismiss, or, in the alternative, for summary judgment, on December 1,

---

[1]Despite asserting in his amended complaint that his constitutional rights were violated, plaintiff pursued only his statutory rights in the remainder of his pleadings.  It is presumed that he abandoned any claims he intended to bring pursuant to 42 U.S.C. § 1983.  In any event, there is no indication that Secretary Gerens actions were taken "under color of state law" as required by § 1983.

2009, to which plaintiff responded on January 8, 2010 (D.E. 25, 36, 37)[2].  Defendant filed a reply to the response on January 27, 2010 (D.E. 40).

## JURISDICTION AND VENUE

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  Venue is proper in this court because the actions about which plaintiffs complain occurred in Nueces County, Texas, which is located in the Southern District of Texas.

## BACKGROUND

### A.  Factual Background

The following recitation of facts is taken from plaintiff's pleadings and evidence in the record, viewed in the light most favorable to him.  Plaintiff, a Caucasian male, worked for the department of the Army for 33 years and began working at the Corpus Christi Army Depot ("CCAD") in 1994.  The last position he held at CCAD was that of a Pneudraulic Systems Mechanic (Declaration of David Stoddard, D.E. 36, para. 2).  In that position, plaintiff was responsible for testing and repairing anti-icing ("A-I") valves, a component of helicopter engines (Id. at para. 5).

Prior to his termination, plaintiff had never been disciplined or counseled for violence or threats to his co-workers (Id. at para. 3).  For almost 10 years at CCAD his supervisor was Robert Lawrence, an African-American.  In the evaluation immediately

---

[2]Plaintiff's response and supporting documentation (D.E. 36, 37) are docketed as pending motions for summary judgment.  The Clerk shall terminate the pleadings insofar as the pleadings purport to be pending motions.

preceding his termination, Lawrence rated plaintiff as "successful" overall and noted that

he effectively communicated with his co-workers and maintained two-way

communications (Evaluation dated March 12, 2007, D.E. 36-1, Ex. A).  On his evaluation

dated March 21, 2006 plaintiff was noted to be a "team player."  (Evaluation dated March

21, 2006, D.E. 36-1, Ex. A).  In his 2004 evaluation plaintiff was described as being

respectful of other personnel and was described as being an asset to the work center

(Evaluation dated March 10, 2004, D.E. 36-1, Ex. A).  His earlier evaluations were

similarly positive.

###    1.  Back Impairment and Work Reassignment

Plaintiff injured his back in June 1995 and has suffered chronic back pain since that

time.  His back pain was exacerbated by an automobile accident in 2005 and he has been

treated by a number of physicians (Stoddard Decl., D.E. 36, para. 6).  His pain becomes

worse with bending, lifting, twisting, prolonged sitting or standing and climbing stairs (Id.

at para. 8).

In 1995 Lawrence had plaintiff work on various small parts until the summer of

1998.  In November 1998 Lawrence assigned plaintiff to work on the "Garrett Anti-Ice

Valve Test & Repair" program because it was considered light duty work (Id. at para. 10).

Plaintiff considered the assignment an "unofficial accommodation" of his back pain

because he could sit or stand at will and could move around when he wanted to (Id. at

para. 11).

Because of his back problems, plaintiff often took leave.  In October 2006, one of plaintiff's supervisors, Edward Garcia, asked plaintiff to obtain documentation from his doctor showing that his back injury was permanent.  Plaintiff obtained a note from a nurse practitioner in his doctor's office stating that due to the chronic nature of plaintiff's illness, there would be days when he was unable to work and that he would need other time off for procedures (Id. at paras. 12-14, and D.E. 36-2, Ex. B).  Edward Garcia told plaintiff that another supervisor, George Garcia, was not satisfied with the documentation, but never told plaintiff what further documentation was needed (Id. at para. 15).  In late 2006 Edward Garcia asked plaintiff to go to the CCAD dispensary to "interpret" the note.  When he returned, plaintiff told Edward Garcia and Theadore Humphrey that the dispensary physician said plaintiff had chronic back pain and would occasionally need to take leave (Id. at para. 16).

On February 16, 2007 plaintiff and his co-workers were informed that Edward Garcia had been reassigned to a different division for 120 days and Humphrey, an African-American man, would fill in until Garcia returned (Id. at para. 18).  On February 28, 2007 Humphrey ordered plaintiff to take his toolbox, which weighed approximately 150 pounds, and move it upstairs, where he had been assigned to safety wire hydro-mechanical units ("HMUs").  The HMU's weighed approximately 30 pounds each and to safety wire one, the employee needed to pick it up from a rack or bin and either place it on a cart to roll to the workbench, or pick it up and carry it to the workbench.  Once on the workbench, the employee had to lift and turn the HMU to complete the wiring of it (Id. at paras. 19-20).

Because of his back injury, plaintiff told Humphrey that he could not move his toolbox upstairs and that he could not wire the HMUs because of his physical limitations (Id. at para. 21).  Humphrey insisted that plaintiff could safety wire the HMU by having another employee lift or turn it for him, but plaintiff disagreed because of the continual lifting and turning required.  Plaintiff asked to be allowed to safety wire the HMU downstairs at his usual work station but was not allowed to do so (Id. at para. 22).

Humphrey told plaintiff that the reason he was being moved to work on the HMU's was because the demand for the A-I valves had decreased.  Plaintiff disputes this assertion (Id. at para. 24).  Plaintiff's coworker, Charles Hardeman, a non-disabled African-American man, had a reduction in his work load and was allowed to take small parts to his downstairs workbench and work on them in the room he had shared with plaintiff for years (Id. at para. 25).  None of the other testers who were temporarily assigned to work for Humphrey were moved from their positions (Id. at para. 26).  Also, although Humphrey wanted plaintiff to work on HMUs, plaintiff learned from other CCAD employees that the HMU workload had decreased as well (Id. at para. 27).

On March 1, 2007 plaintiff and a union representative met with Humphrey to discuss the situation.  Plaintiff asked to be able to work on small parts at his downstairs work station when his A-I valve work was slow, but Humphrey declined the request (Id. at para. 29).  Humphrey also told plaintiff that he had not supplied the necessary documentation regarding his limitations (Id. at para. 28).  It was decided at the meeting that Humphrey would set up a workbench for plaintiff upstairs (Id. at para. 30).  After the

5

meeting, plaintiff went to the CCAD dispensary and obtained a restricted duty slip.  For the following two weeks he was restricted to no bending, no pushing, pulling, carrying or twisting while standing with more than 10 pounds of force, and no work that required an awkward position of the spine (Id. at para. 31; D.E. 36-2, Ex. C).

When plaintiff reported to the upstairs workbench the following Monday morning, no changes had been made to accommodate him.  The same short workbench was in place, there was no mat on the floor and the chair was missing a caster on one leg, making it unsafe and unusable.  Plaintiff returned to his downstairs workbench (Id. at para. 35). Later in the morning CCAD security officers approached plaintiff and told him that if he did not move his tool box upstairs, they would remove him from the facility.  Plaintiff refused to move his tool box and a short time later security officers took his identification badge, accompanied him to the wellness center for a drug test and then escorted him back to his work station (Id. at para. 36-37).

At a meeting with plaintiff, a union steward and Humphrey on March 12, 2007, Humphrey stated that plaintiff could work on T2 sensors.  Plaintiff responded that he did not think the change would accommodate his impairments (Id. at para. 39-40).  After more discussion over the next few days, plaintiff began working on the T2 sensors.  Although the sensors weighed only a few pounds, the work was more strenuous than plaintiff's previous work on the A-I valves because he had to sit down while working on them and because he could not move around as much.  Plaintiff's pain became more intense (Id. at para. 48).  Although Humphrey had told plaintiff that he could stand and walk around if he

6

needed to do so, when plaintiff would leave his work station he would be told by another employee to return to his work station on Humphrey's orders (Id. at para. 49).

Plaintiff called in sick on March 9, 13, 14, and 16. Humphrey told him that he needed to bring in a sick leave slip or he would be considered AWOL. On March 20, 2007 Humphrey issued plaintiff a Leave Control Letter that required him to provide medical certification for all the days that he requested leave for illness or injury (Id. at para. 51-52).

On March 21, 2007 plaintiff met with Humphrey and a union steward and emphasized his desire to be a team player (Id. at para. 53). On March 28, 2007 Humphrey proposed that plaintiff be terminated for defiance of authority and being AWOL. On April 2, 2007 plaintiff told Humphrey that he wanted an appointment with the CCAD Equal Employment Opportunity office ("EEO") and Humphrey made an appointment for him for April 18, 2007 (Id. at paras. 55-56). Humphrey was notified on April 6, 2007 that plaintiff had filed a complaint of discrimination based on harassment and physical ability and that an investigation would be conducted (Notice from Marvin Lucas, D.E. 37-2, Ex. H).

Plaintiff missed work on April 4, 9, 10 and 11. He submitted documentation, signed by a registered nurse who worked in his doctor's office, that he missed work because of medical issues (Stoddard Decl., D.E. 36, para. 58; D.E. 36-2, Ex. K). Despite the note, Humphrey considered plaintiff to be AWOL those days (Stoddard Decl., D.E. 36, para. 59). On May 2, 2007 the CCAD dispensary issued plaintiff a light-duty slip with physical restrictions for 30 days (Id. at para. 60; Dispensary Permit, D.E. 36-2, Ex. L).

7

Later the same day, Humphrey told plaintiff that he was being transferred to the T-55 engine line to work for James LaCour (Stoddard Decl., D.E. 36, para. 60).  On May 8, 2007 the proposed termination was reduced to a 10-day suspension by Joe Herrera, a CCAD supervisor (Stoddard Decl., D.E. 36, at para. 54; D.E. 36-2, Ex. I).

## 2.  Racially Charged Comments

Plaintiff had worked for eight years with Hardeman in what was known as the actuator room.  Hardeman is African-American and plaintiff considered him to be a good friend (Stoddard Decl., D.E. 36 at para. 62).  It was common practice for the two of them, along with their co-workers, to engage in "politically incorrect" banter, including calling one another derogatory race-based names and making other offensive comments toward one another.  Despite the offensive nature of the language, because all of petitioner's co-workers engaged in the exchanges, he considered his colleagues to be joking and never took offense at the comments (Id. at paras 63-65).  Hardeman participated in the banter, both making offensive comments and also being subjected to offensive name-calling. Several people in the shop used the word "nigger" in these conversations and Hardeman never complained (Id. at para. 66; Depo. of Andy Flores, D.E. 37-1, Ex. C, pp. 20-22).

On more than one occasion Hardeman entertained his co-workers with made-up stories of his days in Africa where he had escaped slave-traders because he could run fast and he also acting like a monkey swinging from trees.  Continuing the theme, on one occasion plaintiff referred to Hardeman as a monkey when he was playing dominoes and everyone laughed (Stoddard Decl. at para. 67).

A note in the record dated October 27, 2006 shows that Edward Garcia had been approached by Hardeman earlier that month and that Hardeman complained that the "playing" in the actuator room was getting out of hand.  Specifically, Hardeman complained that plaintiff had called him a "nigger."  Garcia spoke with plaintiff, who told him that Hardeman called plaintiff, who is Mormon, a cracker and a Quaker and asked him how many wives he had.  Two other employees, James Lance and Andy Flores, confirmed that plaintiff and Hardeman played around that way.  Garcia discussed the commander's policy with plaintiff and Hardeman and told both of them that the name-calling and horse-playing would not be tolerated.  Each signed a memorandum to that effect and it was placed in their files (D.E. 25-6, Ex. S, MSPB1084-1086).[3]

### 3.  Virginia Tech Related Comments

On April 17, 2007, plaintiff, Hardeman, and another co-worker, Alan Sarver, were discussing the massacre that occurred at the Virginia Polytechnic Institute and State University ("Virginia Tech") on April 16, 2007, in which a gunman killed 32 people and wounded many others before committing suicide.  In the same vein of tasteless joking in which the employees typically engaged, Hardeman stated that CCAD management probably thought that plaintiff would be the next employee to "go postal" and attack his co-workers, because Humphrey had been harassing plaintiff and "riding his ass."  Plaintiff

---

[3]"Exhibit S" is a copy of the MSPB administrative file which defendant submitted on a computer disc.  The documents are identified by the MSPB number at the bottom of the page.

responded that if he "went postal," he would go after Hardeman first.  Hardeman asked,

"What about Alan?" and plaintiff responded that they would have to decide who went

first.  That was the end of the conversation and Hardeman and Sarver were the only

witnesses to the conversation (Id. at para. 71).

When he testified at the Merit Systems Protection Board ("MSPB") hearing as part

of plaintiff's administrative proceedings in this matter, Hardeman stated that he had no

intention of reporting plaintiff's comments to his supervisor because plaintiff had enough

trouble with Humphrey at the time.  Hardemen also stated that he did not take offense at

the comment.  "I didn't pay it no mind.  I just shook it off.  And Mr. Sarver said that he

wasn't going to say nothing to [Humphrey] either."  (Testimony of Charles Hardeman,

D.E. 25-6, Ex. U, pp. 41-42).  Hardeman did not think the comment was racist, but he also

did not think it was appropriate to make that type of comment in the workplace and

compared it to boarding an airplane and claiming to have a gun (Id. at p. 42).  Hardeman

and Sarver did not discuss the comment further (Id. at 42-43; Testimony of Alan Sarver,

D.E. 37-3, pp. 47-49).  In a statement submitted three days later, Sarver characterized the

statements as having been made in a joking manner (Sarver statement, D.E. 37-3, Ex. K).

A day or two after the Virginia Tech shooting, either April 18 or April 19, 2007,

Hardeman heard on the radio that there had been another shooting at the Johnson Space

Center near Houston.  He had a "funny feeling" about going to work that day, so decided

not to go (Hardeman testimony, D.E. 25, Ex. S, MSPB 00857).  Hardeman stated that his

decision to not go to work that day was not related to the remark made by plaintiff (Id. at MSPB 00857-00858)).

Two other African-American employees, Jesse Goffigon and Lucius Thomas, also decided not to go to work on Monday, April 23, 2007.  Goffigon said in a statement that on the morning of April 23 as he was going into work, he was approached by a man he declined to name who asked him if he was aware that verbal threats had been made against him and some of his co-workers.  Although he had heard some vague references, upon hearing more details of the threats, Goffigon decided not to enter the building until he spoke to his supervisor.  He took annual leave and returned to work the next day without incident (Statement of Jesse Goffigon, D.E. 25-4, Ex. J).  Humphrey identified himself as the person who told Goffigon about Hardeman's remarks (Humphrey testimony, D.E. 25-4, Ex. K, p. 50).

Lucius Thomas said in a statement dated May 15, 2007 that he had not heard that plaintiff had made threats against anyone until a barbeque held on Saturday, April 21, 2007.  There he overheard a conversation "about an incident that had happened at work about some guy going to kill some people in fuel control."  (Statement of Lucius Thomas, Ex. S, MSPB 01030).  Thomas called Humphrey, his supervisor, and asked about the rumor he had heard.  Humphrey told him the rumor was true and Thomas said he was not going to report for work the next day (Id.).  Thomas believed that plaintiff had named him as a person he intended to kill, even though he never talked to anyone who actually heard plaintiff make the statement (Deposition of Lucius Thomas, D.E. 25-4, p. 29).

11

On June 14, 2007 Humphrey contacted the police and complained that plaintiff was driving by his house and giving him hostile glares.  Humphrey was concerned about his family's welfare (Police Report, D.E. 25-7, Ex. W).

On June 22, 2007 Humphrey sent plaintiff a letter proposing his removal from employment (Proposed Removal Letter, D.E. 25-6, Ex. S, MSPB 00998).  The reasons given for the proposed removal were that plaintiff had created a disturbance on April 17, 2007, the day after the Virginia Tech massacre, when he told Hardeman and Sarver that they were numbers 34 and 35 and that when he was finished with them, he would go upstairs and "take out" Humphrey, Thomas and Goffigon.  In addition, the proposed removal was based on the allegation that plaintiff was AWOL on March 28 and 30, and on April 4, 9, 10 and 11, 2007 (Id.).  On August 20, 2007, the proposed removal was approved by Joe Herrera, the director of power train production at CCAD (Decision on Proposed Removal, D.E. 25-7, Ex. AA).

**B.  Procedural Background**

Humphrey initially proposed that plaintiff be terminated on March 28, 2007 (Decision on Proposed Removal, D.E. 37-11, Ex. GG, para. 1).  On April 2, 2007 plaintiff contacted an EEO counselor about filing a complaint, alleging harassment based on a physical disability (D.E. 37-2, Ex. G).  On May 1, 2007 plaintiff filed a formal complaint of discrimination (D.E. 25-7, Ex. X).  He alleged that Humphrey discriminated against him because of his race, age, and physical disability and also in retaliation for his having complained about discrimination (Id.).  On May 8, 2007, plaintiff received notice that the

12

proposed removal was mitigated to a 10-day suspension (Decision on Proposed Removal, D.E. 37-11, Ex. GG, para. 4).

On June 12, 2007 plaintiff wrote a letter to Connie Nelson, the EEO investigator, asking to amend his complaint to include an allegation that Humphrey discriminated against him by moving him to work on "T-55s" under James LaCour and also to complain about the 10-day suspension (Stoddard letter dated June 12, 2007, D.E. 25-7, Ex. X at Bates stamp 000048).  On June 20, 2007 Nelson informed plaintiff that she was accepting his claims of race, age and disability discrimination, but was going to dismiss his claim of reprisal because he had not indicated any prior EEO activity.  Nelson did not address plaintiff's request to amend his EEO complaint (EEO letter dated June 20, 2007, D.E. 37-11, Ex. HH).

On June 22, 2007 plaintiff received the second notice of removal, based on the comments he allegedly made following the Virginia Tech shooting and also on the claim he was AWOL for six days in March and April 2007.  On July 9, 2007 he asked to have his EEO complaint amended to include the notice of removal (D.E. 25-7, Ex. X, Bates stamp 000542 and 000541).  On July 24, 2007 Nelson notified plaintiff that his complaint would not be amended to include the second dismissal because no final action had been taken on the proposed removal (EEO letter of July 24, 2007, D.E. 25-7, Ex. X, Bates stamp 000538).  On August 20, 2007 the proposed removal was made effective by Herrera (Decision on Proposed Removal, D.E. 25-7, Ex. AA).

On August 31, 2007 plaintiff appealed the removal decision to the MSPB (D.E. 25-7, Ex. Y).  On the form, plaintiff checked the box indicating that he was claiming that the agency made errors in applying required procedures, that the agency action or decision was the result of a prohibited personnel practice, or that the agency decision was not in accordance with law.  Plaintiff also checked the box indicating that he was claiming that the agency action or decision was the result of prohibited discrimination based on race, color, religion, sex, national origin, disability or age (Id. at p. 7).

On November 7, 2007 an MSPB hearing was held in Cause No. DA-0752-07-0550-I-1 (D.E. 37-3, Ex. J).  On November 16, 2007, there was an on-site fact finding investigation conducted by Carol Scott, an EEO Investigator in Activity Docket No. ARCCAD07APR01132 (D.E. 37-11, Ex. O).  On December 13, 2007 the MSPB issued its initial decision and affirmed plaintiff's removal based on the April 17, 2007 remarks and also on the AWOL issue.  The decision also addressed plaintiff's affirmative defenses of race, age and physical disability discrimination, finding that he had failed to prove his claims by a preponderance of the evidence (MSPB initial decision, D.E. 25-5, Ex. O).  Plaintiff appealed the decision and on June 23, 2008 the MSPB upheld the initial removal determination based on the April 17 remarks, but vacated the decision on the AWOL charges (MSPB Opinion and Order, D.E. 25-6, Ex. P)  Plaintiff then appealed the MSPB findings that defendant had not unlawfully discriminated against him to the Equal Employment Opportunity Commission ("EEOC"), which issued an opinion concurring with the final opinion of the MSPB on August 26, 2008 (D.E. 25-6, Ex. Q).

14

Plaintiff filed his lawsuit in this court on September 29, 2008 and filed an amended complaint on August 28, 2009 (D.E. 22).  On November 21, 2008, plaintiff received notice from the EEO that because he had filed a civil action on his pending discrimination complaint, and because a decision had not been rendered on his discrimination complaint, the EEO manager was requesting that the EEO complaint be dismissed and all administrative processing of it cease (D.E. 25-7, Ex. Z).

Plaintiff alleges that he was discriminated against based on race and disability and in retaliation for having complained about discrimination.  Plaintiff also seeks judicial review of the final MSPB decision in his case, arguing that it was arbitrary and capricious, unsupported by substantial evidence and/or not in accordance with the law.

In his motion to dismiss, or alternatively, for summary judgment, defendant asserts that plaintiff is bringing a mixed-case cause of action because he is both challenging his removal and also claiming that he was subjected to unlawful discrimination.  Defendant then argues that this court does not have jurisdiction to hear the case because plaintiff first sought relief through the EEO process.  In addition, defendant argues that plaintiff cannot make out a prima facie case of race or disability discrimination and that even if he could do so, he cannot show that the reasons given for his termination were a pretext for discrimination.  Defendant further argues that plaintiff cannot make out a prima facie case of retaliation and cannot prove a causal connection between the protected activity and the adverse action.

Plaintiff counters that he can make out prima facie cases of discrimination and also show that reasons given for the agency determinations were pretexts for discrimination.  In addition, plaintiff argues that this court has jurisdiction over all of his claims and urges the court to set aside the MSPB decision.

## APPLICABLE LAW

### A.  Motion to Dismiss

Defendant asserts that plaintiff's disability and retaliation causes of action should be dismissed because the court lacks subject matter jurisdiction.[4]  The court's dismissal of a case for lack of subject matter jurisdiction is not a decision on the merits and does not prevent the plaintiff from pursuing a claim in a court that has proper jurisdiction.  Hitt v. Pasadena, 561 F.2d 606, 608 (5th Cir. 1977).  A court may dismiss for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.  Home Builders Ass'n of Miss, Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998)(citation omitted).  Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.  Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.

---

[4]Plaintiff moves to dismiss pursuant to FED. R. CIV. P. 12(b)(6) (D.E. 25, p. 1).  However, in the body of his motion, he argues that this court lacks jurisdiction over those claims (Id. at p. 11).  A motion to dismiss based on lack of subject matter jurisdiction should be brought under FED. R. CIV. P. 12(b)(1).

16

1981).  The burden of proof on a Rule 12(b)(1) motion to dismiss is on the party asserting

jurisdiction.  <u>Strain v. Harrelson Rubber Co.</u>, 742 F.2d 888, 889 (5th Cir. 1984).

## B.  Jurisdiction of the Court

Title VII confers subject matter jurisdiction over federal employees' employment

discrimination claims after they have exhausted their administrative remedies.  <u>See</u>  42

U.S.C. § 2000e-16(c).[5]  Depending on the circumstances, federal employees  may exhaust

their administrative remedies through appeals to the MSPB or by filing a complaint with

their agency's EEO office.

The MSPB is an administrative agency that has jurisdiction over particular "adverse

employment actions" affecting federal employees.  In relevant part, the MSPB reviews

actions for removal and suspensions of more than 14 days.  5 U.S.C.A. § 7512.  When a

federal employee has been subject to one of these adverse actions, he is entitled to appeal

to the MSPB.  5 U.S.C. § 7513(d).

Under 29 C.F.R. § 1614.301, a federal employee who asserts that discrimination

was a component of an adverse personnel action (as opposed to simply appealing the

adverse action) has two options.  He may file either a "mixed case complaint" with his

---

[5]Fifth Circuit precedent is unclear regarding whether the exhaustion requirement is simply a prerequisite to filing suit and should be treated as a statute of limitations, or whether it is jurisdictional.  <u>See</u> <u>Pacheco v. Mineta</u>, 448 F.3d 783, 788, n. 7 (5th Cir. 2006).  Because plaintiff exhausted his administrative remedies in this case, this aspect of the jurisdiction issue is not addressed.

agency's EEO office, or he may file a "mixed case appeal" directly to the MSPB, but he cannot do both.  McAdams v. Reno, 64 F.3d 1137, 1141 (8th Cir. 1995).

The MSPB does not have jurisdiction over discrimination claims that are not related to appealable adverse actions, but it can entertain appeals in "mixed cases," where an employee alleges a Title VII violation in relation to one of the specified adverse employment actions.  5 U.S.C. § 7702(a)(1)(B)(i)-(iv);  Chappell v. Chao, 388 F.3d 1373, 1375 (11th Cir. 2004).  To qualify as a mixed case appeal, the employee must allege that "an appealable agency action was effected, in whole or in part, because of discrimination on the basis of race, color, religion, sex, national origin, handicap or age."  29 C.F.R. § 1614.302.

When a complainant appeals to the MSPB, the matter is assigned to an Administrative Judge ("AJ") who takes evidence and eventually makes findings of fact and conclusions of law.  Butler v. West, 164 F.3d 634, 638 (D.C. Cir. 1999)(citing 5 C.F.R. §§ 1201.41(b), 1201.111).  The AJ's decision becomes final if neither party, nor the MSPB itself, seeks further review within 35 days.  Id. at 638-639 (citing 5 C.F.R. § 1201.113).  If the parties or the agency petition the full Board to review an initial decision, and the Board denies the petition for review, the initial decision becomes final.  If the Board grants the petition, its decision becomes final when issued.  Id. at 639 (citing 5 C.F.R. § 1201.113(b) and (c).  At this point, the complainant can either appeal the final decision of the MSPB to the Equal Employment Opportunity Commission ("EEOC"), or appeal the entire claim (or any part thereof) to the appropriate district court.  Id. (citing 5

18

C.F.R. § 1201.157; 5 U.S.C. §7703(b), 5 C.F.R. § 1201.175; 29 C.F.R. § 1614.310(b)).  If the MSPB fails to render a judicially reviewable decision within 120 days from the filing of a mixed case appeal, the party can pursue his claim in federal district court.  Id. (citing 5 U.S.C. § 7702(e)(1)(B).

In the alternative, a federal employee can elect to file a "mixed case complaint" with his agency's EEO office.  Id. at 638.  If an employee chooses this route, within 30 days of the final EEO decision, the employee can file a mixed-case appeal with the MSPB or a civil discrimination action in federal district court.  Id. (citing 29 C.F.R. §§ 1614.302(d)(1)(ii), 1614.302(d)(3), 1614.310(a).  If 120 days pass without a final decision from the agency's EEO office, the same avenues of appeal again become available: the complainant can file either a mixed case appeal with the MSPB or a civil action in district court.  Id. (citing 5 U.S.C. §§ 7702(e)(1)(A), 7702(e)(2); 29 C.F.R. §§ 1614.302(d)(1)(i), 1614.310(g); 5 C.F.R. § 1201.154(b)(2)).

The first-filed of the mixed case complaint or the mixed case appeal is considered to be the employee's election of remedy.  29 C.F.R. §1614.302.  Defendant asserts that plaintiff first filed a complaint with the EEO and later filed an MSPB claim and abandoned his EEO claim.  Defendant then argues that because he first raised his termination in the EEO claim that this court is without jurisdiction to hear his MSPB mixed-case cause of action.  He further argues that if the EEO's dismissal of the amendment of the proposed termination of June 22, 2007 meant the removal was a new cause that could be brought

under the MSPB claim, then the claims that were brought in the EEO action should be dismissed because this court lacks jurisdiction to hear them.

However, a review of the record reveals flaws in defendant's argument. While it is true that plaintiff first filed an EEO complaint on May 1, 2007, it was not a mixed-case complaint at that time, because he had not yet been subjected to an action that was appealable to the MSPB. Although he was facing a proposed removal, a final decision had not yet been made on the proposal and when it was made, it was limited to a 10-day suspension. Even if plaintiff had wanted to appeal to the MSPB, the Board would not have had jurisdiction to hear the appeal because it only hears appeals of suspensions of 14 days or more. 5 U.S.C.A. § 7512.

Plaintiff did not have a reason for filing a mixed-case complaint until August 20, 2007 when the second proposed termination was made effective by Herrera. Plaintiff appealed the removal decision to the MSPB on August 31, 2007 and he included a claim that the decision was the result of prohibited discrimination. That was the first opportunity he had to challenge both an action appealable to the MSPB and to complain of race and disability discrimination. He did so, making the MSPB mixed-case appeal his first election of a remedy in the case. See McCoy v. United States Postal Service, 108 M.S.P.R. 160, *167 (2008)(When factual circumstances giving rise to employee's discrimination claim had not occurred when he filed his first Board appeal, election requirement of 29 C.F.R. § 1614.302(b) did not apply).

20

Moreover, even if plaintiff had been able to file and had chosen to file a mixed-case complaint with the EEO, pursuant to the statute and regulations, if 120 days passes without a final decision from the EEO office, plaintiff can either file a mixed case appeal with the MSPB or a civil action in district court.  5 U.S.C. §§ 7702(e)(1)(A), 7702(e)(2); 29 C.F.R. §§ 1614.302(d)(1)(i), 1614.310(g); 5 C.F.R. § 1201.154(b)(2)).  Plaintiff filed his mixed-case appeal with the MSPB 123 days after he file his EEO complaint.  At that point, even if there were a valid mixed-case claim pending, the MSPB would have taken jurisdiction over plaintiff's removal and over his discrimination complaints.

Because plaintiff filed a valid mixed-case appeal, and because he pursued the MSPB administrative remedy to its completion, this court has jurisdiction to hear his claims.  Defendant's motion to dismiss based on jurisdiction should be denied.

## C.  Summary Judgment Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See FED.R.CIV.P. 56(c).  An issue is material if its resolution could affect the outcome of the action.  Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir. 2001).  The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, drawing all justifiable inferences in favor of

the party opposing the motions.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475

U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  The Court will not weigh

the evidence or evaluate the credibility of witnesses.  <u>Caboni v. General Motors Corp.</u>, 278

F.3d 448, 451 (5th Cir. 2002).

     The movant bears the initial burden of showing the absence of a genuine issue of

material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91

L.Ed.2d 265 (1986).  If the movant demonstrates there is an absence of evidence to

support the nonmovant's case, the nonmovant must come forward with specific facts

showing that there is a genuine issue for trial.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587, 106 S. Ct.

at 1356.  To sustain this burden, the nonmovant cannot rest on the mere allegations of the

pleadings.  <u>See</u> <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. at 2553; <u>Caboni</u>, 278 F.3d at 451;

Fed.R.Civ.P. 56(e).  After the nonmovant has been given an opportunity to raise a genuine

factual issue, if no reasonable juror could find for the nonmovant, summary judgment will

be granted.  <u>Caboni</u>, 278 F.3d at 451.

## D.  Removal Action

     Plaintiff argues that the decision to remove him from his job should be reversed

because it was arbitrary and capricious, unsupported by substantial evidence and/or not in

accordance with the law.  In a "mixed-case" appeal from the MSPB, discrimination claims

raised administratively are reviewed *de novo*.  <u>Aldrup v. Caldera</u>, 274 F.3d 282, 285-286

(5th Cir. 2001)(citing 5 U.S.C. § 7703(c)).  Non-discrimination claims are reviewed on the

administrative record and the court will uphold the MSPB decision unless it is clearly

arbitrary and capricious, unsupported by substantial evidence or otherwise not in accordance with law.  Williams v. Wynne, 533 F.3d 360, 373 (5th Cir. 2008)(citing Aldrup, 274 F.3d at 287).

Substantial evidence, as required to support an agency's findings, is more than a mere scintilla.  It is such evidence as a reasonable mind might accept as adequate to support a conclusion.  Leatherbury v. Department of Army, 524 F.3d 1293, 1300 (Fed. Cir. 2008).  The court must determine whether, considering the record as a whole, the agency's evidence is sufficient to be found by a reasonable factfinder to meet the evidentiary burden applicable to the particular case.  Id. (citing Bradley v. Veterans Admin., 900 F.2d 233, 234 (Fed. Cir. 1990).  "'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Id. (quoting Jacobs. v. Dep't of Justice, 35 F.3d 1543, 1546 (Fed. Cir. 1994) and Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

In this case, the decision to remove plaintiff was based on charges prepared by Humphrey stating that plaintiff had created a disturbance by implying that he would inflict bodily harm on his supervisor and co-workers.  Specifically, Humphrey asserted that on April 17, 2007 plaintiff told Hardeman and Sarver that, in reference to the Virginia Tech shooting, they were numbers 34 and 35 and when he was finished with them he would go upstairs and "take out" Humphrey, Thomas and Goffigon.  Humphrey further alleged that

as a result of the statement, Goffigon, Thomas and Hardeman were afraid to come to work and each took a day of annual leave (Initial Decision of MSPB, D.E. 25-5, Ex. O, p. 2).[6]

The AJ noted that the Prevention of Violence in the workplace policy in effect at CCAD defined workplace violence in the following manner:

> Workplace violence is defined as any act of physical violence, threats of physical violence, harassment, intimidation, or other threatening, disruptive behavior that occurs at the work site.  Workplace violence may also include oral or written statements, gestures, facial or other physical expressions which constitute communication and a wide variety of other disruptive behavior.

(Id. at 3-4).

In addition, plaintiff had received a memorandum in June 2006 where the following was noted:

> Misconduct such as baiting another employee, threats of bodily harm, actual or attempted stealing, creating disturbances, insubordination, discourtesy, verbal abuse, horseplay in the workplace, discrimination, sexual harassment, suggestive and/or obscene comments, . . . or conduct unbecoming to a Federal Employee is not acceptable behavior in the work environment.

(Id. at  4).

The AJ summarized the witnesses' testimony, noting that only Hardeman testified that he heard plaintiff say that he was going to "take out" Humphrey, Goffigon and Thomas.  Sarver did not hear the remark about the other co-workers and believed plaintiff was joking when he said that Hardeman would be "number 34" and Sarver "number 35." Plaintiff denied mentioning Humphrey, Goffigon and Thomas in the conversation and

---

[6]Plaintiff also was discharged for having been AWOL for several days, but that finding was later vacated by the MSPB (Opinion and Order, D.E. 25-6, Ex. P).

testified that he spoke only in response to Hardeman telling him that management probably thought he was going to "go postal" next because of the trouble he was having with Humphrey and that plaintiff replied in a teasing manner that if he did, he would get Hardeman first.  When either Hardeman or Sarver asked who he would get first he replied that they would have to take a number.  Plaintiff denied saying he would "take out" Goffigon, Humphrey or Thomas, or that he mentioned them at all (Id. at 6).  Plaintiff further testified that when he made the remarks he meant no harm and when he heard that employees were upset, he called Hardeman to ask if he knew the remark was a joke (Id.).

The AJ stated that based on the testimony of Hardeman, Sarver and plaintiff, she found that plaintiff made the "numbers 34 and 35" remark.  Based on Hardeman's testimony, she found that plaintiff made the remark that he would "take out" the other employees.  The AJ noted that plaintiff denied making the remark, but found Hardeman's testimony more credible than plaintiff's on the issue (Id. at 8).  The AJ also noted that Hardeman stated that his absence from work was unrelated to plaintiff's comments and that he did not think the plaintiff would actually harm him (Id. at 5).

The AJ concluded that she found it more likely than not true that plaintiff made the statements described in the notice of proposed removal and that the comments created a disturbance.  Her finding was based on the following: (1) plaintiff's statements became a topic of discussion in the work place; (2) some employees feared for their safety and others were concerned with how the agency would deal with plaintiff; (3) Thomas and Goffigon missed two days of work because plaintiff's comments made them fearful; (4)

25

plaintiff's statements caused CCAD to use time and resources conducting an investigation and (5) employees were apprehensive in plaintiff's presence (Id. at 9).

Plaintiff argues that the AJ's credibility choices were clearly unreasonable because there was a great deal of contradictory testimony in the record.  Plaintiff is correct that Hardeman is the only witness who testified that plaintiff made the statement about taking out the other three employees and he (Hardeman) was not afraid of plaintiff and did not decide to stay home based on plaintiff's remarks.  In addition, Sarver testified that he thought plaintiff was joking and that he was never afraid of him.

Based on the record, an equally plausible explanation for the employees becoming fearful of plaintiff is that although he made the remarks in a joking manner, the conversation took on sinister overtones in the retelling.  However, the issue is not how a different factfinder might rule following a *de novo* review of the facts of the case, but whether the administrative determination is supported by substantial evidence in the record as a whole.  Haebe v. Dep't of Justice, 288 F.3d 1288, 1298 (Fed. Cir. 2002).  In this case the AJ pointed to evidence in the record supporting her decision.

Moreover, the AJ made a point of stating that she believed Hardeman's testimony over that of plaintiff and that was the basis of her finding that plaintiff made the remarks.  Credibility determinations by AJ's are ordinarily entitled to great weight.  Larson v. Department of the Army, 260 F.3d. 1350, 1355 (Fed. Cir. 2001).  They have been described as "virtually unreviewable."  Blank v. Dept. of the Army, 247 F.3d 1225, 1228 (Fed. Cir. 2001)(citing Hambsch. v. Dep't of the Treasury, 796 F.2d 430, 436 (Fed. Cir.

26

1986).  The AJ, as fact finder, is not obliged to accept or reject a witness' testimony *in toto*, but may evaluate the testimony in light of other evidence to determine whether and how much of the witness' testimony is credible.  <u>Hathaway v. Merit Systems Protection Bd.</u>, 981 F.2d 1237, 1242 (C.A. Fed. 1992).

The AJ in this case acknowledged the many inconsistencies in the evidence, but found that inconsistencies in Hardeman's statements during the course of the investigation did not relate to material issues and that his account of plaintiff's statements was clear and consistent (Initial Decision of MSPB, D.E. 25-5, Ex. O at 8).  She found that Hardeman's demeanor while testifying demonstrated truthfulness (<u>Id.</u> at 9).  In contrast, the AJ found that plaintiff's testimony appeared to be disingenuous and contrived and that his demeanor was that of someone struggling to provide a credible version of events that would allow him to admit to having made a remark he hoped to explain was a joke among co-workers, without admitting to anything further (<u>Id.</u>).

While it is clear that plaintiff disagrees with the AJ's interpretation of the evidence presented at the MSPB hearing, the AJ supported her decision by pointing to substantial evidence in the record.  Accordingly, the MSPB decision regarding plaintiff's removal is affirmed.

27

**E.  Title VII Claim**

Plaintiff asserts that he was discriminated against on the basis of race and also in retaliation for having filed an EEO claim.[7]  Under Title VII, it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.  42 U.S.C.A. § 2000e-2.  The analysis of a Title VII case is well known:

> The plaintiff must establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor.  Once established, the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason.  The burden then shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination.  But, if the defendant has offered a legitimate nondiscriminatory reason for its action, the presumption of discrimination derived from the plaintiff's prima facie case 'simply drops out of the picture,' . . .and 'the ultimate question [is] discrimination *vel non*.'

Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089-90 (5th Cir. 1995)(citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 246, 253-257, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981);  McDonnell Douglas Corporation v. Green, 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1971)).

---

[7]The finding that the MSPB decision on plaintiff's removal should be affirmed has no bearing on his discrimination claims, which are reviewed *de novo*.  See Morris v. Rumsfeld, 420 F.3d 287, 294 (3rd Cir. 2005)(when federal employee comes to court to challenge the administrative disposition of his discrimination claims, the court considers the claims *de novo* and is not bound by the results of the administrative process).

The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff.  Grimes v. Tx. Dept. of Mental Health, 102 F.3d 137, 140 (5th Cir. 1996)(citing Hicks, 509 U.S. 502, 510-511, 113 S.Ct. 2742, 2749, 124 L.Ed.2d 407 (1993)).  Title VII plaintiffs must ordinarily prove their claims through circumstantial evidence and may do so by demonstrating that a defendant's articulated non-discriminatory reason was pretextual.  Grimes, 102 F.3d at 141 (citations omitted).  A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may, but does not necessarily, permit the trier of fact to conclude that the employer unlawfully discriminated.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).  "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.  Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law."  Id., 530 U.S. at 148-149, 120 S.Ct. at 2109.

In order to make out a prima facie case, a plaintiff must show that (1) he belongs to a protected class;  (2) he was qualified to do his job;  (3) despite his qualifications, his employment situation was adversely affected and (4) similarly situated employees outside the protected group were treated more favorably.  Bryan v. McKinsey & Co., Inc., 375 F.3d 358 (5th Cir. 2004)(citing Okoye v. Univ. of Texas Houston Health Sci. Ctr., 245 F.3d 507, 512 (5th Cir. 2001)).

29

### 1.  Race Discrimination

Plaintiff asserts that he was discriminated against on the basis of race when he was (1) terminated; (2) transferred out of the room and the job he had been performing for 10 years; (3) suspended for 10 days; (4) charged with being AWOL and (5) denied overtime opportunities.  Plaintiff, who is Caucasian, is within a protected group and is qualified to do his job.  The actions about which he complains took place and defendant does not dispute that such actions were adverse employment actions.  Accordingly, he has met the first three prongs of the test to make out a prima facie case.

Regarding the fourth part of the test, defendant argues that plaintiff cannot show that similarly situated individuals were treated more favorably than he was.  To make such a showing, the plaintiff may present circumstantial evidence that he was treated differently than similarly situated non-members of the protected class.  Williams v. Trader Pub. Co., 218 F.3d 481, 484 (5th Cir. 2000).  In disparate treatment cases involving employee misconduct and discipline, the plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances.  In other words, he must show that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees.  Okoye v. Univ. of Texas Houston Health Science Center, 245 F.3d 507, 514 (5th Cir. 2001)(internal quotations omitted).

 Regarding plaintiff's 10-day suspension, the reason given for it was that he refused to move upstairs to work when his supervisor told him to do so.  Plaintiff has presented no evidence that someone outside his protected class refused an order from his supervisor but

was not punished.  Similarly, plaintiff has failed to present any evidence that another employee outside his protected class was not considered AWOL when he failed to report to work for several days without providing the requested documentation.  Moreover, it is unclear that the AWOL charge was an adverse employment action given that the finding that plaintiff had been AWOL was later vacated by the MSPB.  Plaintiff has failed to make out a prima facie case of discrimination based on these actions.

Plaintiff also argues that he after he moved upstairs he requested overtime but was not given any when other employees outside his protected class received overtime hours. Particularly, plaintiff asserts that between February and March 2007, employees Thomas, Flores and Lance were given overtime hours performing work on A-I valves but plaintiff was not.  However, the evidence plaintiff points to, an overtime log (D.E. 37-11, Ex. FF), is not sufficient to support his contention because there is no indication that Flores and/or Lance were outside of plaintiff's protected class and it also does not show that they were working on A-I valves.  In addition, the log shows that nine other employees, including Hardeman, did not work any overtime hours.  Moreover, during February 2007 plaintiff apparently missed work because of bronchitis and back pain (Dispensary note dated February 13, 2007, D.E. 37-11, Ex. N) and in March 2007 plaintiff missed work on March 9, 13, 14 and 16 because of back pain (Stoddard Decl., D.E. 36, para. 51).  Presumably plaintiff did not work all of his scheduled hours during the weeks he missed work because of illness.  This evidence does not support a conclusion that plaintiff was denied overtime

while members outside his protected class received overtime.  Accordingly, he cannot make out a prima face case of race discrimination based on these facts.

Regarding his termination, plaintiff asserts that he did not make the threats that resulted in his termination, but rather responded to a joking comment from Hardeman, who started the conversation by saying that CCAD management probably thought that plaintiff would be next to "go postal." (Stoddard Decl. D.E. 36, para. 71).  Plaintiff replied that if he did "go postal," Hardeman would be his first victim.  Continuing with the joke, Hardeman asked "What about Alan?" referring to Sarver and plaintiff told him they would have to decide.  Plaintiff flatly disputes that he made any remark about any other co-worker or that he seriously threatened Hardeman or Sarver.

If plaintiff's version of the facts is believed, he engaged in distasteful joking with his African-American co-worker, but only plaintiff was punished for his comments.  Based on those facts, he has made out a prima facie case of discrimination.  Defendant argues that even if plaintiff made out a prima facie case of discrimination, his termination was justified because he violated the CCAD policy against violence in the workplace.

Plaintiff has submitted evidence that the reason given for his termination was a pretext for discrimination.  In addition to plaintiff's own statement, he points to Sarver's testimony and statement that he believed plaintiff to be joking and did not feel threatened by plaintiff's remarks (Sarver testimony, D.E. 37-3, Ex. J, p. 48; Sarver statement, D.E. 25-6, Ex. S).  Nor did Hardeman take the comments seriously (Hardeman testimony, D.E. 25-6, Ex. U, pp. 41-43).  If plaintiff's version of events were believed, nothing he said

could be considered a real threat to any employee.  Without the threat, all that remains is that he and Hardeman, who is outside plaintiff's protected class, engaged in a joking conversation for which plaintiff was terminated.  Accordingly, fact issues exist which preclude summary judgment on the issue of whether plaintiff was the victim of racial discrimination when he was terminated.

Plaintiff also asserts that he has made out a prima face case based on the fact that he was transferred upstairs to work when Hardeman was not.  Depending on the circumstances, a lateral transfer to a position with equal pay could amount to a materially adverse action.  Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 485 (5th Cir. 2008). A transfer to a job that is more arduous or less prestigious could make the action materially adverse, but a subjective preference for a different job does not.  Id. (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).  Here, plaintiff did not want to transfer upstairs because he thought it would hurt his back.  Arguably, then, the transfer was materially adverse.  Neither Hardeman nor any of the other testers who worked for Humphrey were transferred from their positions (Stoddard Decl., D.E. 36, paras. 25-25).  Based on the transfer, plaintiff has made out a prima facie case of race discrimination.

In his motion for summary judgment, defendant did not discuss plaintiff's transfer or any legitimate, non-discriminatory reason the agency had for transferring plaintiff. Rather, he limits his discussion to plaintiff's termination.  In any event, the reason Humphrey gave for moving plaintiff upstairs was this his workload downstairs was

decreasing and the workload in the T2 sensor area was increasing (Humphrey testimony in

MSPB proceeding, D.E. 25-4, p. 14; Humphrey Depo., D.E. 37-1, Ex. D, p. 24).

However, plaintiff disputes that his workload had decreased (Stoddard Decl., D.E. 36,

para. 24).  In addition, plaintiff asserts that Hardeman's workload had decreased, but he

was allowed to remain downstairs and also was allowed to take small parts downstairs and

work on them there (Id.. para. 25).  Another employee, Andy Flores, also testified that

Hardeman did not have much work to do (Flores Depo., D.E. 37-1, Ex. C, pp. 13-14).

Accordingly, fact issues exist on the issue of whether plaintiff was discriminated against

on the basis of race when he was transferred upstairs to work in a different area.  Summary

judgment on this issue is denied.

### 2. Retaliation

Plaintiff also asserts that the actions taken against him were in retaliation for his

having engaged in "protected activity." In addition to barring discrimination in the

workplace based on race, color, religion, sex or national origin, Title VII also forbids an

employer from discriminating against an employee because that individual opposed any

practice made unlawful by Title VII, or made a charge, testified, assisted, or participated in

a Title VII proceeding or investigation.  42 U.S.C. § 2000e-3(a).  The Supreme Court held

in Burlington Northern & Santa Fe Railway Co. v White, 548 U.S. 53, 126 S.Ct. 2405, 165

L.Ed.2d 345 (2006), that the anti-retaliation provision does not confine the actions and

harms it forbids to those that are related to employment or occur at the workplace.  The

Court also concluded that the provision covers those employer actions that would have

been materially adverse to a reasonable employee.  Id., 548 U.S. at 57, 126 S.Ct. at 2409.

The Court specifically rejected the Fifth Circuit holding in Mattern v. Eastman Kodak Co.,

104 F.3d 702, 707 (5th Cir. 1997), which limited retaliation claims to so-called "ultimate

employment decisions."  White, 548 U.S. at 67, 126 S.Ct. at 2414.  Instead, the Court

defined "materially adverse" actions as those actions which, in the context of a particular

case, were harmful to the point that they could well dissuade a reasonable worker from

making or supporting a charge of discrimination.  Id., 548 U.S. at 68, 126 S.Ct. at 2415.

The Court went on to note that it was important to separate significant from trivial

harms, because Title VII does not set forth a general civility code for the American

workplace.  Id. (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118

S.Ct. 998, 140 L.Ed.2d 201 (1998).  An employee's decision to report discriminatory

behavior does not immunize that employee from petty slights and minor annoyances that

often take place at work and that all employees experience.  Rather, the Title VII

retaliation provisions prohibit employer actions that are likely to deter victims of

discrimination from complaining to the EEOC, the courts and their employers.  Id. (citing

Robinson v. Shell Oil, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)).

Plaintiff argues that he was discharged in retaliation for having filed an EEO claim.

To make out a prima facie case of retaliation, a plaintiff must show (1) that he engaged in

an activity protected by Title VII; (2) the employer took an adverse employment action

against him and (3) there is a causal connection between the protected activity and the

adverse employment action.  Brazoria County, Texx. v. EEOC, 391 F.3d 685, 692 (5th

Cir. 2004).  "Protected activity" is opposition to any practice rendered unlawful by Title VII.  42 U.S.C. § 2000e-3(a).  To establish causation, the employee must demonstrate that the employer knew about the employee's protected activity.  Manning v. Chevron Chem. Co., LLC, 332 F.3d 874, 883 (5th Cir. 2003).

Plaintiff engaged in a protected activity when he inquired about filing an EEO claim on April 2, 2007.  He suffered an adverse action when he subsequently was discharged.  It is undisputed that the employer knew about his protected activity. Accordingly, plaintiff has made out a prima facie case of retaliation.  As discussed above, although defendant presented evidence that the discharge decision was made for a legitimate, non-discriminatory reason, plaintiff has responded by pointing to evidence of pretext in the record.  For this reason, fact issues exist which preclude summary judgment for defendant on his retaliatory discharge claim.

Regarding the transfer claim, plaintiff was ordered to move upstairs on February 28, 2007 but did not seek help from the EEO office until April 2, 2007.  Based on the timing, the decision to transfer him could not have been taken in retaliation for his having engaged in protected activity because he had not yet done so.  Judgment will be entered for defendant on plaintiff's retaliatory transfer claim.

## F.  Rehabilitation Act Claim

Plaintiff asserts that his rights were violated under the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq*.  Discrimination claims brought pursuant to the Rehabilitation Act

are analyzed in the same manner as claims brought under the ADA.  29 U.S.C. §§ 791(g) and 794(d).

### 1.  Disparate Treatment

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).  A "disability" includes a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2).  A "qualified individual with a disability" means an "individual with a disability who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires."  Id. at § 12111(8).

Where a plaintiff can offer only circumstantial evidence to prove a violation of the ADA, the court applies the burden-shifting framework set forth in McDonnell Douglas. See EEOC v. Chevron Phillips Chemical Co., 570 F.3d 606, 615 (5th Cir. 2009).  Under this framework, the plaintiff must first make a prima facie showing of discrimination that (1) he is disabled, has a record of having a disability, or is regarded as disabled; (2) he is qualified for his job, (3) he was subjected to an adverse employment action on account of his disability or perception of his disability, and (4) he was replaced or treated less favorably than non-disabled employees.  Id. (citing McInnis v. Alamo Comm. College Dist., 207 F.3d 276, 279 (5th Cir. 2009).  If the employer can articulate a legitimate non-

37

discriminatory reason for the adverse employment action, the McDonnell Douglas burden-shifting framework falls away and the issue becomes discrimination *vel non.*  Reeves v.Sanderson Plumbing Prods., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)[8].

### 2.  Failure to Accommodate

A failure to accommodate claim under the ADA is distinct from a claim of disparate treatment.  42 U.S.C. §§ 12112(a) and (b)(5)(A).  EEOC regulations define "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position."  29 C.F.R. § 1630.2(o)(1)(ii).  An employee who requests an accommodation has the responsibility of informing his employer.  Chevron Phillips, 570 F.3d at 621.  The employee must explain that the adjustment in working conditions or duties that he seeks is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase "reasonable accommodation."  Id.  Once the employee makes a request for a reasonable accommodation, the employer is obligated to engage in an "interactive process," or to have "a meaningful dialogue with the employee to find the best means of accommodating that disability."  Id. (quoting Tobin v. Liberty Mut.

---

[8]Although Reeves was brought under the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.*, the Fifth Circuit has applied it in cases alleging discrimination under many different statutes, including the ADA.  Chevron Phillips, 570 F.3d at 615, n. 6.

Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005)).  The process requires "communication and

good-faith exploration."  Id. (quoting Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 871

(6th Cir. 2007)).  When an employer does not engage in a good faith interactive process,

the employer violates the ADA–including when the employer discharges the employee

instead of considering the requested accommodations.  Id. (citing Cultera v. Bd. of

Supervisors of La. St. Univ., 429 F.3d 108, 113 (5th Cir. 2005)).

    In this case, defendant first argues that plaintiff is not disabled under the ADA.  For

purposes of the ADA, a "physical impairment" is "any physiological disorder or condition

. . . affecting one or more of the following body systems: neurological, musculoskeletal,

[etc.]" 29 C.F.R. § 1630.2(h)(1).  Simply having an impairment is not enough to make one

disabled under the statute; a plaintiff must also show that the impairment substantially

limits a major life activity.  Chevron Phillips, 570 F.3d at 614.  A plaintiff must have more

than a diagnosis of an impairment–he must prove a disability by offering evidence that the

extent of the limitation in terms of his own experience is substantial.  Albertson's Inc. v.

Kirkenburg, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999).  "Major life

activities" include, but are not limited to, caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing and learning."  29 C.F.R. § 1630.2(i).

Lifting, reaching, sitting and standing can also be considered major life activities.  Jenkins

v. Cleco Power, LLC, 487 F.3d 309, 315 (5th Cir. 2007)(citing Dutcher v. Ingalls

Shipbuilding, 53 F.3d 723, 725 n. 7 (5th Cir. 1995)).

Defendant argues that there is no evidence of plaintiff being disabled because up until January 2007 he had never asked for any accommodation from CCAD to do his work.  In addition, defendant argues that after plaintiff was told to move upstairs to work on the HMU's, he asked to be allowed to work on them downstairs.  Defendant asserts that the only reason plaintiff did not want to work upstairs was that he wanted to remain downstairs where he had been working and where he would not be under the eye of his supervisor, Humphrey.

Plaintiff counters that the work he was doing downstairs was compatible with his physical limitations.  When he was told to move upstairs and his impairment became an issue, he provided medical evidence to support his request for accommodation.  He has since provided medical evidence of his impairment (See generally, D.E. 37-4 through 37-10, Ex. M) and has provided evidence in the form of his declaration that his impairments keep him from performing household duties such as vacuuming, laundry, mowing the lawn or other heavy yard work, cooking or preparing meals because he cannot lean over the counter for an extended period of time, grocery shopping because he cannot lift the bags of groceries, walking his dog, fishing, or attending sporting events, movies or the theater, lifting his grandchildren, sitting at a computer for long, or having sex with his wife (Stoddard Decl., D.E. 36, para. 8).  Significantly, the dispensary permits issued by CCAD on March 15, 2007 and May 2, 2007 indicated that plaintiff could not sit, stand, or walk without a change in position for more than 15 minutes in an hour, could do no kneeling or

bending and could not push, pull, carry, or twist while standing with more than 10 pounds of force (Dispensary permit, D.E. 36-2, Exs. G and L).

Plaintiff has provided evidence that he is limited in the major life activities of walking, sitting and standing.  See Jenkins, 487 F.3d at 315 (employee was disabled where evidence showed that with intermittent breaks he could sit up to three hours in a day and where he testified and others noticed that he was uncomfortable when sitting during training).  Accordingly, he has met the first two prongs of the test:  He is disabled but was qualified to do the job he had been doing for the past 10 years.  He must next show that he was subject to an adverse employment action on account of his disability and was treated less favorably than his non-disabled co-workers.

Plaintiff cannot complain that the decision to transfer him was an adverse employment action based on his disability, because the issue of disability did not arise, or come to his supervisors' attention, until he was asked to take on new duties.  Any adverse action would necessarily have had to occur after he was asked to move upstairs and refused, citing his back problems.  At that point, the only possible adverse actions to which he could have been subjected were the alleged failure to accommodate his disability and his removal.

Regarding the question of accommodations, defendant points out that plaintiff's request for accommodations was met when he was provided a taller bench, a comfortable chair and a mat on which to stand.  Plaintiff testified that he eventually moved upstairs because his supervisor did not require him to move his toolbox upstairs and because they

41

provided him with the equipment he needed (David Stoddard's MSPB testimony, D.E. 25-4, Ex. E, pp. 38-40).

Nevertheless, his back still hurt because he had to sit so much (Id. at 40; Stoddard Decl., D.E. 36, para. 48).  When he would stand and walk around to ease his back pain, he would be told to return to his work bench (Stoddard Decl, D.E. 36, para. 49). In May 2007 plaintiff was moved again to work on small parts in the T-55 sub-assembly shop with James LaCour (MSPB testimony of Joe Herrera, D.E. 25-5, p. 21).  Plaintiff left the work place on June 4, 2007 because of back pain and did not return to the job (MSPB testimony of Stoddard, D.E. 25-4, Ex. E, pp. 75-76).  His removal from the job became permanent on August 20, 2007.

It is clear from the record that plaintiff's supervisors had knowledge that he needed to change position every 15 minutes or so (Dispensary permits, D.E. 36-2, Exs. G and L). However, according to plaintiff, when he stood up and walked around to relieve his pain, he was told to return to his workbench on Humphrey's orders (Stoddard Decl., D.E. 36, para. 49).  A fact issue exists on the issue of whether plaintiff's employer engaged in a good-faith interactive process to communicate and explore options for accommodating plaintiff's disability--namely allowing him to move around as necessary--or terminated him instead of considering the requested accommodations.  Accordingly, defendant is denied summary judgment on this issue.

Plaintiff also argues that he was retaliated against based on his disability.  To establish a prima facie case of retaliation under the ADA, a plaintiff must show (1) that he

42

engaged in an activity protected by the ADA; (2) that he suffered an adverse employment action and (3) a causal connection between the protected act and the adverse action. Seaman v. CSPH, 179 F.3d 297, 301 (5th Cir. 1999). Requesting an accommodation, even if it is later determined that the employee making the request is not disabled, is a protected activity so long as the employee had a good faith belief that he was covered by the ADA. Bryson v. Regis Corp., 498 F.3d 561, 577 (6th Cir. 2007)(citations omitted). If the plaintiff establishes a prima facie case, the McDonnell Douglas analysis applies.

Plaintiff in this case requested accommodations in the form of an appropriate chair, a workbench at an appropriate height, a mat, and the ability to sit and stand at will and walk around as necessary to alleviate pain. Although he eventually received the items he requested, when he would briefly walk around in an effort to reduce his pain he was told to return to his workbench. His supervisor attempted to remove him from his position and later succeeded in removing him from his position. Plaintiff has produced evidence of a causal relationship between the protected activity and his discharge because his employer was aware that he had requested accommodations. Manning, 332 F.3d at 883.

As discussed in the section on race discrimination above, defendant has proffered a legitimate, non-discriminatory reason for the removal, but plaintiff has produced evidence of pretext. Accordingly, fact issues exist which preclude entry of summary judgment for defendant on the issue of whether plaintiff was retaliated against when he sought accommodations for his disability.

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss and, alternatively, motion for summary judgment (D.E. 25) is granted in part and denied in part.  Specifically (1) judgment is entered for defendant on plaintiff's claim that his removal from service was arbitrary and capricious and the order of the MSPB regarding plaintiff's dismissal is affirmed; (2) Judgment is entered for defendant on plaintiff's claims that he was discriminated against based on race or disability insofar as his claim is based on his 10-day suspension, being considered AWOL, and not being given overtime; (3) Judgment is entered for defendant on plaintiff's claim that the decision to move him upstairs was made in retaliation for his having engaged in protected activity.  Summary judgment is denied on plaintiff's claims that (1) He was subjected to race discrimination based on his transfer and termination; (2) He was subjected to disability discrimination based on his failure to accommodate and termination claims and (3) He was subjected to retaliation based on his termination claims.

ORDERED this 3rd day of March, 2010.

_____

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE