UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| DAVID D. STODDARD, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. 2:08CV313 |
| § | |
| JOHN M. McHUGH, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND VERDICT OF THE COURT

Following a jury trial waiver and consent of the parties, this case was tried to the court May 10-14, 2010. Judgment is entered for the Defendant.

## FINDINGS OF FACT

Plaintiff David D. Stoddard, a Caucasian male, worked as a civilian employee for the Department of the Army for 32 years and began working at the Corpus Christi Army Depot ("CCAD") in 1994. In 2007 plaintiff was employed as a WG-10 Mechanic in the Fuel Control Branch Work Center, and in that position he was responsible for testing and repairing anti-icing ("A-I") valves, a component of helicopter engines.

Plaintiff injured his back in 1995 while lifting a heavy lid at CCAD. He filed a workmen's compensation claim and missed 45 days of work. In 2004 he re-injured his back while power washing at home, and in 2005 he injured his back in a car accident. He suffers from a herniated disk. After consulting with an expert plaintiff decided not to have surgery because of the complications and the possibility of paralysis. He is being treated by Dr.

Potter, a comprehensive pain management doctor. He has been taking the pain medication Oxycontin since 2006.

In the fall of 2006, plaintiff's supervisor was Edward Garcia, and he worked in a downstairs room at CCAD known as the actuator room. Edward Garcia was aware of plaintiff's back injury because he and plaintiff had had many conversations about it. Plaintiff produced a note from Dr. Potter in November 2006 which explained that plaintiff may need time off from work due to the chronic nature of his back injury. Plaintiff considered his assignment to the actuator room an unofficial accommodation of his back injury.

Charles Hardeman, who is African American, also worked in the actuator room, and it was in this room that other employees took their breaks and played dominoes. There was quite a bit of joking in the actuator room, and some of the jokes were not politically correct. Plaintiff and Hardeman frequently engaged in name calling and joking about race. In October 2006, Hardeman became upset when plaintiff addressed him using the "N" word, and reported plaintiff's statement to his supervisor Edward Garcia. When Garcia approached plaintiff, plaintiff complained about Hardeman calling plaintiff names. Both plaintiff and Hardeman were reprimanded about showing respect to co-workers in the workplace.

In February 2007, plaintiff was assigned a new supervisor, Ted Humphrey, who is African American. Plaintiff told one of his co-workers, Lucious Thomas, that "he would not work for another black son of a bitch." He told another employee, Jimmy Conner, that "he had worked for one black n----- and he wasn't going to work for another one." Other

employees, including Hardeman, either heard plaintiff say the same thing, or knew of plaintiff's statements about Humphrey.

At the time Humphrey became plaintiff's supervisor, Edward Garcia told Humphrey that there were several employees with leave control issues, and Humprey was told to handle these issues. Plaintiff was one of those employees who was believed to be abusing his leave privileges.

On February 28, 2007, Humphrey told plaintiff that he was going to be moved from the downstairs actuator room, where he tested and repaired A-I valves, to the upstairs area, where he would be required to safety wire hydro-mechanical units (HMUs). Humphrey believed that plaintiff's workload had diminshed, and Humphrey wanted plaintiff working on other components. Plaintiff refused, claiming that he could not move his toolbox nor could he work on HMUs because of his back injury. According to plaintiff, his back injury prevented him from moving the toolbox, which was on wheels but weighed about 150 pounds, and from handling the HMUs, which weigh about 30 pounds. This was the first time that Humphrey became aware of plaintiff's back problems.[1]

After several days, a note from plaintiff's doctor, and several trips to the CCAD dispensary, Mr. Humphrey, though he refused to allow plaintiff to remain downstairs in the

---

[1] It is undisputed that plaintiff never filled out or formally applied for the medical placement program at CCAD. According to Dora Benavides, the Medical Placement Manager, she was contacted in August 2007 by plaintiff's then-supervisor, James LeCour, about medical placement and advised him that plaintiff needed to fill out an application. Plaintiff was terminated before he completed a medical placement application.

actuator room, reassigned plaintiff to repair T-2 sensors, which weigh only a few ounces. Humphrey had plaintiff's toolbox moved upstairs instead of requiring plaintiff to do it, and provided all the accommodations requested by plaintiff's personal doctor and the CCAD dispensary physician: a higher bench, an ergonomic chair, and a cushioned mat, and Humphrey agreed that plaintiff could take frequent breaks and walk around as needed. Plaintiff was not demoted and he received no reduction in pay.

Because of plaintiff's refusal to comply with Humphrey's initial order to move upstairs, Humphrey took disciplinary action, recommending that plaintiff be terminated. Joe Herrera, the Director of Power Train Production, was assigned to investigate the proposed discipline, and he mitigated the recommended removal to a ten-day suspension.

On March 22, 2007, Humphrey issued a leave control letter to Plaintiff. The letter explained that plaintiff had been counseled in October and November 2006 regarding his abuse of the leave policy, and yet there had been no improvement. Plaintiff was advised that all leave must be supported by a letter from a physician for a period of at least 90 days.

Plaintiff was upset about the leave control letter and the proposed termination, and he asked his supervisor to make an appointment with an EEO counselor so that he could make a complaint.[2] Humphrey made the appointment on April 2, 2007, and plaintiff dropped his EEO packet off at the EEO office on April 18, 2007.

---

[2] At CCAD, employees were not allowed to make EEO appointments. The appointment had to be made by the employee's supervisor.

4

In April 2007, a student at Virginia Tech shot and killed more than thirty students on campus. Hardeman was concerned because he had a daughter in college at the time. On April 17, 2007, Hardeman and a co-worker, Alan Sarver, were discussing the shooting in the actuator room. Hardeman and Sarver's backs were to the door. Plaintiff cracked the door and listened to some of the conversation and then pointed to Hardeman and Sarver and said "You are going to be number 34 and you are going to be number 35, and after that I'm going upstairs and take out [Ted] Humphrey, [Lee] Goffigon, and [Lucious] Thomas." Humphrey, Goffigon and Thomas are African American.

After plaintiff made the statement, Sarver, who believed plaintiff was joking, immediately turned to Hardeman and asked if he was going to report the statement to their supervisor. Hardeman stated that he would not because plaintiff already had enough trouble with Humphrey. Hardeman and Sarver must have told some of their co-workers, because within a couple of days, Humphrey approached Hardeman and Sarver, and ordered that they provide written statements regarding the incident to the Security Office at CCAD.

The following Monday, Hardeman, Thomas, and Goffigon, employees in the Fuel Control Branch, failed to show for work. Hardeman did not come to work because over the weekend he learned of a shooting in the workplace at NASA, and given the statements by plaintiff and the shooting at NASA, Hardeman had a bad feeling about going to work. Goffigon did not report to work after Humphrey approached him and told him about plaintiff's threats. Thomas learned of the threats over the weekend and called Humphrey and also did not report to work on Monday.

Several employees who worked in the same area as Plaintiff were afraid to work with him and filed complaints. Some employees had heard that plaintiff had purchased a gun. Lucious Thomas and Charles Hardeman filed EEO complaints. Betty Vaden submitted a letter addressed to Ted Humphrey, expressing her fear of working around plaintiff. Jimmy Connors was concerned about plaintiff's mental status. Plaintiff was removed from the Fuel Control Branch area and placed in an area where employees worked on T-55s under the supervision of James LeCour. While working in LeCour's shop, plaintiff was not allowed to walk around–he couldn't even walk to the coke machine.

After the threats had been reported to the Security Office, Humphrey again proposed that plaintiff be terminated for the threats and for violating the leave policy. Joe Herrera again performed an investigation and this time he concurred with Humphrey. Plaintiff was terminated effective August 24, 2007. Plaintiff appealed and eventually the termination was upheld on the ground that plaintiff had made threats in the workplace, but not for violation of the leave policy.

Plaintiff and Humphrey lived in the same neighborhood. Plaintiff was upset over Humphrey's actions and several times plaintiff drove by Humphrey's home. On one occasion, plaintiff reported to the police that a trailer in Humphrey's driveway encroached on to the sidewalk by two inches. At the very time that the police were speaking to Humphrey about plaintiff's complaint, plaintiff drove by Humphrey's house. Humphrey was very concerned about plaintiff's behavior because he had a wife and a three year old daughter at home.

In addition to plaintiff, several employees at the Fuel Control Branch have been disgnosed with disabilities. Humphrey has a 70% disability from the VA because of injuries to his shoulder, back, and knees. Alan Sarver, caucasian, is disabled, as is James Lance who is also caucasian. All are able to do the work of a WG10 mechanic.

## APPLICABLE LAW

The claims remaining after entry of summary judgment and entry of judgment as a matter of law are: (1) whether plaintiff was unlawfully terminated based upon race; (2) whether plaintiff was unlawfully terminated based upon his disability; (3) whether plaintiff was unlawfully terminated in retaliation for engaging in protected activity; (4) whether the defendant failed to accommodate plaintiff's disability.

### A. Title VII Claim – Race Discrimination

Plaintiff asserts that he was discriminated against on the basis of race and also in retaliation for having filed an EEO claim. Under Title VII, it is unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin. 42 U.S.C.A. § 2000e-2. The analysis of a Title VII case is well known:

> The plaintiff must establish a prima facie case that the defendant made an employment decision that was motivated by a protected factor. Once established, the defendant bears the burden of producing evidence that its employment decision was based on a legitimate nondiscriminatory reason. The burden then shifts back to the plaintiff to prove that the defendant's proffered reasons were a pretext for discrimination. But, if the defendant has offered a legitimate nondiscriminatory reason for its action, the presumption of discrimination derived from the plaintiff's

>prima facie case 'simply drops out of the picture,' . . .and 'the ultimate question [is] discrimination *vel non*.'

Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1089-90 (5th Cir. 1995)(citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 246, 253-257, 101 S.Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corporation v. Green, 411 U.S. 792, 803, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1971)). The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff. Grimes v. Tx. Dept. of Mental Health, 102 F.3d 137, 140 (5th Cir. 1996)(citing Hicks, 509 U.S. 502, 510-511, 113 S.Ct. 2742, 2749, 124 L.Ed.2d 407 (1993)).

Here plaintiff has no direct evidence of discrimination. He relies on circumstantial evidence, and thus the court must engage in the McDonnell Douglas burden shifting analysis. A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may, but does not necessarily, permit the trier of fact to conclude that the employer unlawfully discriminated. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

In order to make out a prima facie case, a plaintiff must show that (1) he belongs to a protected class; (2) he was qualified to do his job; (3) despite his qualifications, his employment situation was adversely affected and (4) similarly situated employees outside the protected group were treated more favorably. Bryan v. McKinsey & Co., Inc., 375 F.3d

358 (5th Cir. 2004)(citing <u>Okoye v. Univ. of Texas Houston Health Sci. Ctr.</u>, 245 F.3d 507, 512 (5th Cir. 2001)).

Plaintiff failed to make out a prima facie case of race discrimination. While he belongs to a protected class, he was qualified to do his job, and he was terminated from that job, plaintiff failed to show that similarly situated employees outside the protected group were treated more favorably. Plaintiff produced no evidence that any employee outside of his protected class made a threatening statement similar to that made by plaintiff and yet was not terminated.

Moreover, plaintiff produced absolutely no evidence that race was a motivating factor in his termination. While jokes about race may have been common among co-workers in the actuator room, there was no evidence that plaintiff's supervisor, Ted Humphrey, engaged in any of the joking or comments about race. There was no evidence that Humphrey took plaintiff's race into consideration when he made the recommendation to terminate plaintiff, and no evidence that Joe Herrera took plaintiff's race into consideration when he independently investigated the matter and concurred with Humphrey's recommendation.

Plaintiff makes much of his own testimony that he was baited into making the statement and that he was only joking, and he relies heavily on Sarver's testimony that Sarver believed plaintiff was joking. Plaintiff's testimony of what was said and how it occurred is not credible. Plaintiff's claim that he was baited into making the statement was not consistent with Hardeman or Sarver's testimony. Even if Sarver believed plaintiff was joking, Sarver was immediately aware that plaintiff had made an unacceptable statement in

9

the workplace because it was Sarver who turned to Hardeman and asked if Hardeman intended to report the statement. The statement disrupted the workplace for at least two weeks until plaintiff was moved to LeCour's shop. Employees missed work and were afraid to work around plaintiff. All employees had been given a copy of, and were expected to comply with the employer's policy for the prevention of violence in the workplace. Defendant had the right to terminate plaintiff for threatening violence in the workplace, regardless of whether plaintiff intended the statement to be a joke.

**B.     Title VII – Retaliation**

Plaintiff also alleges he was terminated in retaliation for having engaged in protected activity. In addition to barring discrimination in the workplace based on race, color, religion, sex or national origin, Title VII also forbids an employer from discriminating against an employee because that individual opposed any practice made unlawful by Title VII, or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a).

To make out a prima facie case of retaliation, a plaintiff must show (1) that he engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against him and (3) there is a causal connection between the protected activity and the adverse employment action. Brazoria County, Texas. v. EEOC, 391 F.3d 685, 692 (5th Cir. 2004). "Protected activity" is opposition to any practice rendered unlawful by Title VII. 42 U.S.C. § 2000e-3(a). To establish causation, the employee must demonstrate that the

employer knew about the employee's protected activity. Manning v. Chevron Chem. Co., LLC, 332 F.3d 874, 883 (5th Cir. 2003).

Plaintiff asked Humphrey to make an appointment with the EEO counselor on April 2, 2007, and plaintiff dropped his EEO packet off at the EEO office on April 18, 2007. On April 17, plaintiff made the comments which resulted in his termination. On May 8, 2007, Joe Herrera ordered that plaintiff be suspended for a period of ten days for his insubordination and failure to comply with Humphrey's direct order to move upstairs. On June 22, 2007, Humphrey forwarded his formal memo proposing to terminate plaintiff for his threats in the workplace and abuse of the leave policies. It is clear that Humphrey knew of plaintiff's EEO complaint, and it will be assumed that Joe Herrera was aware of plaintiff's EEO complaint. As soon as Humphrey learned of plaintiff's statements in the workplace, sometime on or after April 18, 2007, Humphrey began to take the steps to terminate plaintiff. Plaintiff has shown the required causal connection.

The burden shifts to the defendant to prove that plaintiff would have been terminated even absent plaintiff's EEO activity. The defendant clearly has done so. The defendant had an interest in promoting his workplace policy regarding violence. As indicated earlier, the plaintiff's remarks were immediately recognized by Hardeman and Sarver as inappropriate, the workplace was disrupted by the comments, and employees expressed fear of working with or near Plaintiff. Plaintiff has failed to prove that he was terminated in retaliation for his filing of EEO complaints. Plaintiff would have been terminated even absent his EEO activity.

**C.     Disability Discrimination**

Plaintiff asserts that his rights were violated under the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.*, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, ("ADA").  Discrimination claims brought pursuant to the Rehabilitation Act are analyzed in the same manner as claims brought under the ADA.  29 U.S.C. §§ 791(g) and 794(d). Plaintiff contends he is disabled and that his disability was not accommodated and that he was terminated because of his disability.

**1.  Disparate Treatment**

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment."  42 U.S.C. § 12112(a).  A "disability" includes a "physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2).  A "qualified individual with a disability" means an "individual with a disability who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires."  Id. at § 12111(8).

Where a plaintiff can offer only circumstantial evidence to prove a violation of the ADA, the court applies the burden-shifting framework set forth in McDonnell Douglas.  See EEOC v. Chevron Phillips Chemical Co., 570 F.3d 606, 615 (5th Cir. 2009).  Under this framework, the plaintiff must first make a prima facie showing of discrimination that (1) he

is disabled, has a record of having a disability, or is regarded as disabled; (2) he is qualified for his job, (3) he was subjected to an adverse employment action on account of his disability or perception of his disability, and (4) he was replaced or treated less favorably than non-disabled employees. Id. (citing McInnis v. Alamo Comm. College Dist., 207 F.3d 276, 279 (5th Cir. 2009). If the employer can articulate a legitimate non-discriminatory reason for the adverse employment action, the McDonnell Douglas burden-shifting framework falls away and the issue becomes discrimination *vel non.* Reeves v.Sanderson Plumbing Prods., 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)[3].

Plaintiff has shown he suffers from a disability. For purposes of the ADA, a "physical impairment" is "any physiological disorder or condition . . . affecting one or more of the following body systems: neurological, musculoskeletal, [etc.]" 29 C.F.R. § 1630.2(h)(1). Simply having an impairment is not enough to make one disabled under the statute; a plaintiff must also show that the impairment substantially limits a major life activity. Chevron Phillips, 570 F.3d at 614. A plaintiff must have more than a diagnosis of an impairment–he must prove a disability by offering evidence that the extent of the limitation in terms of his own experience is substantial. Albertson's Inc. v. Kirkenburg, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). "Major life activities" include, but are not limited to, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking,

---

[3]Although Reeves was brought under the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq*., the Fifth Circuit has applied it in cases alleging discrimination under many different statutes, including the ADA. Chevron Phillips, 570 F.3d at 615, n. 6.

breathing and learning." 29 C.F.R. § 1630.2(i). Lifting, reaching, sitting and standing can also be considered major life activities. Jenkins v. Cleco Power, LLC, 487 F.3d 309, 315 (5th Cir. 2007)(citing Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 725 n. 7 (5th Cir. 1995)).

For purposes of the ADA, a "physical impairment" is "any physiological disorder or condition . . . affecting one or more of the following body systems: neurological, musculoskeletal, [etc.]" 29 C.F.R. § 1630.2(h)(1). Simply having an impairment is not enough to make one disabled under the statute; a plaintiff must also show that the impairment substantially limits a major life activity. Chevron Phillips, 570 F.3d at 614. A plaintiff must have more than a diagnosis of an impairment–he must prove a disability by offering evidence that the extent of the limitation in terms of his own experience is substantial. Albertson's Inc. v. Kirkenburg, 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). "Major life activities" include, but are not limited to, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing and learning." 29 C.F.R. § 1630.2(i). Lifting, reaching, sitting and standing can also be considered major life activities. Jenkins v. Cleco Power, LLC, 487 F.3d 309, 315 (5th Cir. 2007)(citing Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 725 n. 7 (5th Cir. 1995)).

Plaintiff has provided evidence that he is limited in the major life activities of walking, sitting and standing. See Jenkins, 487 F.3d at 315 (employee was disabled where evidence showed that with intermittent breaks he could sit up to three hours in a day and where he testified and others noticed that he was uncomfortable when sitting during training). Plaintiff testified about the herniated disk in his back and provided medical records, physician orders,

and dispensary permits. The dispensary permits issued by CCAD on March 15, 2007 and May 2, 2007 indicated that plaintiff could not sit, stand, or walk without a change in position for more than 15 minutes in an hour, could do no kneeling or bending and could not push, pull, carry, or twist while standing with more than 10 pounds of force. Accordingly, plaintiff has demonstrated that he suffers from a disability. It was undisputed that plaintiff was qualified to perform his job.

Plaintiff did not prove, however, that he was terminated because of his disability or that he was treated less favorably than non-disabled workers. As indicated earlier, plaintiff was terminated because he made threatening statements in the workplace, and he produced no evidence that he was terminated because of his disability.

### 2. Failure to Accommodate

A failure to accommodate claim under the ADA is distinct from a claim of disparate treatment. 42 U.S.C. §§ 12112(a) and (b)(5)(A). EEOC regulations define "reasonable accommodation" as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). An employee who requests an accommodation has the responsibility of informing his employer. Chevron Phillips, 570 F.3d at 621. The employee must explain that the adjustment in working conditions or duties that he seeks is for a medical condition-related reason, but the employee does not have to mention the ADA or use the phrase "reasonable accommodation." Id. Once the employee makes a request for

15

a reasonable accommodation, the employer is obligated to engage in an "interactive process," or to have "a meaningful dialogue with the employee to find the best means of accommodating that disability." Id. (quoting Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 108 (1st Cir. 2005)). The process requires "communication and good-faith exploration." Id. (quoting Kleiber v. Honda of Am. Mfg., 485 F.3d 862, 871 (6th Cir. 2007)). When an employer does not engage in a good faith interactive process, the employer violates the ADA–including when the employer discharges the employee instead of considering the requested accommodations. Id. (citing Cultera v. Bd. of Supervisors of La. St. Univ., 429 F.3d 108, 113 (5th Cir. 2005)).

When plaintiff was asked to transfer upstairs, Humphrey learned for the first time of plaintiff's disability. Plaintiff had been unofficially accommodated before that time by his previous supervisors by being allowed to work on A-I valves in the actuator room. After plaintiff brought in his personal physician's work limitations, which were incorporated by the dispensary physician, all of accommodation requests were met. Plaintiff's tool box was moved for him, he was given a taller bench, an ergonomic chair, and a cushioned floor mat. He was allowed to work on parts which weighed less than ten pounds, and he was told he would be allowed to move around.

Plaintiff makes much of his inability to walk around. Plaintiff especially complains of his inability to walk to the coke machine after he was moved to James LeCour's shop. But plaintiff spent very little time at LeCour's shop. Plaintiff was not at work for most of the second half of April 2007. He was placed at LeCour's shop May 1, 2007. He missed many

work days in May, and he did not report to work after June 4, 2007. Significantly, though plaintiff testified he was not able to walk to the coke machine, he did not testify that he was unable to stand up and *walk around his desk and workplace area*. This was also true while plaintiff was still upstairs working in Fuel Control. Plaintiff did not state that he could not get up and move around his desk.

The treatment of plaintiff was consistent with the treatment of other disabled employees: Alan Sarver, James Lance, and Ted Humphrey. All were accommodated. If the accommodations were insufficient, plaintiff could have taken advantage of the medical placement program, but he failed to do so before he was terminated.

**D.     Retaliation for activity protected by ADA**

Plaintiff also argues that he was retaliated against based on his disability. To establish a prima facie case of retaliation under the ADA, a plaintiff must show (1) that he engaged in an activity protected by the ADA; (2) that he suffered an adverse employment action; and (3) there was a causal connection between the protected act and the adverse action. Seaman v. CSPH, 179 F.3d 297, 301 (5th Cir. 1999). Requesting an accommodation, even if it is later determined that the employee making the request is not disabled, is a protected activity so long as the employee had a good faith belief that he was covered by the ADA. Bryson v. Regis Corp., 498 F.3d 561, 577 (6th Cir. 2007)(citations omitted). If the plaintiff establishes a prima facie case, the McDonnell Douglas analysis applies. As discussed, defendants produced a legitimate nondiscriminatory reason for plaintiff's move upstairs and his termination. Plaintiff was moved upstairs because the work on A-I valves had slowed down,

and plaintiff's termination was due to threats he made in the workplace. Plaintiff failed to prove his ADA-related retaliation claims.

Judgment is entered for defendant on all claims.

ORDERED this 16th day of July, 2010.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE